The Judges delivered their opinions.*
Judge Green.
This was an action of ejectment upon the demise of John L. and P. J. Barziza against John Hopkins and William Hodgson, and Portia, his wife. Upon the trial, the defendants demurred to the evidence. From this demurrer, the. case appears, in substance, to be as follows:
The lessors of the plaintiff claim the land in question, as the heirs at law of Lucy Paradise, who was entitled to it under the will of her father, Philip Ludioell, who died in 1767. She was born in Virginia; and, in 1769, intermarried with John Paradise, in England, a native of that country, where she resided with her husband until 1788, *277 when they removed to Virginia, but, shortly after, returnocl to England. John Paradise died in England, in Decemher, 1795. His widow afterwards came and resided in Virginia, where she died intestate, on the 24ih of April, 1814. Upon her death, Hopkins and Hodgson, in right of their wives, who were nieces of Mrs. Paradise, entered into the land, claiming that tlieir wives were her heirs at law. Mrs. Paradise had two daughters born in England, one of whom died an infant. The other, Bticy, on the 4f;h of April, 1787, intermarried in England, with Barziza, a Venetian nobleman. Mrs. Barziza died in Italy in 1800, and her husband died in Italy on 1he 13th of September, 1807. Neither Count Barziza nor his wife was ever in the United States. They had two children, the lessors of the plaintiff, John B., born in Venice, February 20th, 1789, and Philip ./., born in Venice, August 10th, 1796. Upon this demurrer, judgment was given for the defendants.
The question, whether these grand-children of Mrs. Paradise can succeed to her inheritance, as her heirs at law, depends upon the question, whether they were citizens of Virginia, at the time of the death of Mrs. Paradise. For, no one who is not a citizen, can, by the laws of Virginia, inherit lands here; and, all who are citizens can take by inheritance. The lessors of the plaintiff, being horn in a foreign country, of parents also born in foreign countries, cannot claim to he citizens, unless that character is conferred upon them by the statutes of Virginia, or by the constitution and laws of the United States. To ascertain the effect of the statutes upon this subject, it will be necessary to take an historical review of all the statutes passed upon the subject; because, every statute (after the first,) passed in Virginia, although differing in some of their provisions from the former slatutes, yet reserved all rights of citizenship acquired under former laws, and left such rights unaffected by the subsequent statutes.
*278 The first act passed upon this subject, was that of May, 1779. But, before we examine the effect of that and the subsequent acts upon the subject under consideration, it is necessary to ascertain what was the situation of Mrs. Paradise, before the act of 1779, in respect to her title to the rights of citizenship in Virginia.
She was born in Virginia, long before the Revolution, when Vii’ginia was subject to the Crown of England. She removed to England many years before the Revolution, and there intermarried with a native of England; and, with her husband, permanently resided there from the time of her marriage, in 1769, until 1788, when she and her husband resided temporarily in Virginia; and, in 1789, returned to England, where she resided until after her husband’s death in 1795; and how long after, does not appear.
" If there were no Legislative declaration on the subject, it might be questionable, whether the fact of her birth in Virginia* notwithstanding her residence as aforesaid in England, would give her a character of a citizen of Virginia, after the Revolution; or, whether her residence in England gave her the character of a subject of Great Britain, and denied to her the character of a citizen of Virginia. The place of birth, it is true, in general, determines the allegiance. But, in this ease, there was no independent government of Virginia, to which she could owe allegiance at the time of her birth. Yet, it may be said, that her allegiance was due to the actual government of the country of her birth; and, that when the sovereignty of that country was changed by revolution or otherwise, her allegiance still continued to be due to the existing government thereof, for the time being. On the other hand, when the people of Virginia renounced the government of Great Britain and declared themselves independent, it would seem that all persons then actually and permanently domiciliated in Virginia., even although hostile to the Revolution, were members of the community,. and must be *279 considered as citizens, hound and protected by her laws, and owing allegiance to her government, unless they elected to adhere to their former allegiance, within a reasonable time; and that, from necessity, and from the principles of all government, whilst those who were then permanently domiciliated in Great Britain, whether born there or in Virginia, not being members of the Virginia community, nor bound by the laws, nor capable of the protection of Virginia, could not, therefore, be considered as her citizens, unless they elected within a reasonable time to adhere to Virginia. This reasonable and only convenient rule was adopted by the Legislature of Virginia, as will be seen hereafter; and I think that Mrs. Paradise, was not a citizen, unless declared so by a Legislative act.
At the May session of 1779, an act passed for escheating the real, and forfeiting the personal property in Virginia, of all British subjects; the third section whereof is in these words: “ And for preventing doubts who shall bn deemed British subjects, within the meaning of this act, it is hereby declared and enacted, that, (first) subjects of his Britannic majesty, who, on the 19th day of April, in the year 1777, when hostilities were commenced at Lexington between the United States of America and the other parts of the British empire, were resident, or followed their vocations in any part of the world, other than the said United States, and have not since either entered the public employment of the said.Sta1.es, or joined the same;, and by overt acts adhered to them; and, (secondly,) &<;., shall he deemed British subjects, within the intention of this act.” This act expressly declares, that the property of British subjects shall be deemed to be vested in the Commonwealth, the real by way of escheat, the personal by forfeiture; and directs proceedings to ho instituted by way of inquisition, for escheating and forfeiling the same. There is no exception in favor of any person coming within the description of the act, neither of femes coverts nor infants.
*280 At'the October session, 1779, this act was amended by an act, the fifth section of which is asfollows: “that all femes coverts, widows and infants, natives of this State, now, or lately resident in Great Britain, or other parts beyond the seas, all widows, natives of this State, or widows of natives of this State, or infants, the issue of natives of this State, and all other persons, either natives of this State, or .who were actually married to natives of this State, and bond fide inhabitants thereof, at least one year at any time within four years, next before the commencement of hostilities on the 19th of April, 1775, or .who left North America at any time before the passing of the act declaring what shall be treason, (October, 1776,) and have not been' guilty of any overt act injurious to the rights or liberties of America; and, also, all persons who left this State in their non-age, and have, during their absence, arrived to full age, within four years last past; and, also, the barons of femes coverts, natives of this State as aforesaid, as far as relates to any property which they held in right of sucll femes coverts, shall, and they are hereby declared to be excepted out of the said recited act; provided, they have already returned, or shall return to this Commonwealth and become citizens thereof within two years, to be computed in the case of infants, from the time they arrive to the age of 21 years, and- in all other cases, from the end of this present session of Assembly.” Mrs. Paradise and her daughter fall within the description of British subjects in the act of May, 1779, and neither of them ever came within the exceptions of the act of October, 1779. If there were any doubt of the import of the words in the act of May, 1779, “subjects of his Britannic Majesty,” and Whether they embraced natives of Virginia residing in England on the 19th of April, 1775, the act of October, 1779, is a complete Legislative exposition of that of May, 1779, and shews that persons of that description were embraced by the latter; for, otherwise, there would have been no necessity for excepting them by the act of October, *281 1779, upon the condition only of their returning and becoming citizens within a limited time. The Legislature declaring, by the act of May, 1779, that the real property of British subjects had escheated to the Commonwealth, in effect declared, that they, (to wit: all coming within the description of that act,) were aliens. Whatever, therefore, might be thought of a claim to. citizenship in behalf of Mrs. Paradise, by reason of her birth in Virginia, in the absence of all Legislative provision upon the subject, it cannot be doubted that it was perfectly competent to the Legislature to prescribe any rule which they thought proper, for ascertaining who should be deemed to be aliens, and who citizens.
The two acts above referred to, decisively ascertain, who shall be considered as British subjects, and therefore aliens, and embrace the caso of Mrs. Paradise, unless another act, passed at the session of May, 1779, should be supposed to except cases such as hers. This act passed subsequent in point of time to that of May, 1779, before recited. But, as the law then was, they were to be considered as cotemporaneous, and both taking effect from the first day of the session, and are, therefore, to be considered as one act. That act is entitled, “ an act declaring who shall be deemed citizens of this Common wealth,” and provides, 11 that all white persons born within the territory of this Commonwealth; and all who have resided therein two years next before the passing of this act; and all who shall hereafter migrate into the same, other than alien enemies, and shall, &e., and, all infants, wheresoever born, whose father, if living, or otherwise, whose mother was a. citizen at the time of their birth; or who migrate hither, their father, if living, or otherwise their mother, becoming a citizen; or who migrate hither without father or mother; shall be deemed citizens of this Commonwealth, until they relinquish, &c.; and all others, not being citizens of any of the United States of America, shall be deemed aliens.-” These two acts seemingly conflict with each other, when *282 the expressions of each are taken in their natural and most extensive sense; and, if the Legislature had not expounded them, there might have been great difficulty in ascertain-ing> in order to reconcile them, and give them both effect, whether the last act excepted from the generality of the description of British subjects in the first act, natives of Virginia residing in Great Britain; or, whether the first act excepted from the generality of the description of citizens of Virginia, all such as were residing elsewhere than in the United States. In either case, both acts would have ample subjects for their operation. We are, however, relieved from this difficulty, by the act of October, 1779, which, by Legislative authority, gives to the acts of May, 1779, the latter construction. I conclude, therefore, that Mrs. Paradise was not, at the time of the birth of Mrs. Barziza, and from that time up to May, 1779, a citizen of Virginia. But, if she were, the act of May, 1779, did not confer on Mrs. Barziza the character of citizen, even if it did confer that, character upon her mother; for, her father was living at the time of the passing of the act, and never was a citizen; and the act did not confer upon the “ infant” the character of citizen, by reason of the citizenship of the mother, at the time of the birth of the infant, if the father was living at the passing of the act. The word “ otherwise,” when it first occurs in the act, can have no other meaning, than that the condition of the mother should not affect the condition of the infant, if the father was living. For, the same word occurs a second time in the act, and with the same context, where it can mean nothing, but that the child, if the father be dead at the time of emigration, may be a citizen, if the mother becomes a citizen; but, not so, if the father be living. The act referred to the condition of the father, if alive, and if dead, then, and then only, to that of the mother, for detennining the condition of the infant child.
In October, 1783, another act passed, entitled, “ an act for the admission of emigrants, and declaring the rights to *283 citizenship;” which provides, “ that all free persons born within the territory of this Commonwealth; "all persons, not beiug natives, who have obtained a right of citizenship under the act of May, 1779, aforesaid; and also all cliildren, -wheresoever born, whose fathers or mothers are or were citizens at the time of the birth of such children, shall he deemed citizens of this Commonwealth, until they shall relinquish that character, in the manner herein-after mentioned;” and repeals the act of May, 1779, entitled, “ an act declaring who shall be deemed citizens of this Commonwealth. ”
In October, 1786, an act was passed to the effect (as to this subject,) of the act of 1783, verbatim, repealing expressly the act of 1779, and all acts coming within the meaning of that act, and, consequently, the act of 1783.
In 1792, the same act was re-enacted verbatim, except that it saved all rights of citizenship obtained “ under former laws,” instead of confining that saving to rights obtained under the act of 1779; and repealing all laws coming within the purview of that act. And so our statute law upon this subject remains to this time. All these acts contain various provisions for enabling aliens to acquire the character of citizens, and for enabling citizens to expatriate themselves. The act of 1783, (if Mrs. Paradise was not a citizen before, either by her birth, or by virtue of the act of 1779,) may have conferred that character upon her; and, if it did, the next enquiry would he, whether the act of 1786 conferred upon Mrs. Barziza, the same character. These acts, which are in the same words, are susceptible of only two constructions; either, that they were wholly retrospective, and embraced only children already horn; or, both retrospective and prospective, embracing children horn and to be horn. If retrospective only, then the word “are” must he considered as meaning the same as “ are now,” and apply to fathers or mothers then living only; and the word “were” would apply, only to the case of children horn of fathers or mothers then dead. To *284 give the clause this effect, it would be necessary to transpose some words, and interpolate others, so as to read thus: “ whose fathers or mothers, if living, now are citizens, or if dead, were, at the time of the. birth of their children, citizens, &c.” This transposition would, I think, be violent; and, I cannot suppose that the Legislature ever contemplated to sanction the consequences of such a construction. The effect would be, that, if a naturalized citizen brought with him to this country, a family of infant children born abroad, before his naturalization, and died before the passing of the act, they would be aliens, though if the parent was alive when the act passed, they would be citizens. If a naturalized citizen, alive when the act passed, had adult children born abroad before his naturalization, and residing, and continuing to reside in their native country for life, they would be ipso facto citizens by virtue of ' the act. If a native or naturalized citizen had children born abroad after the act,- they would be.aliens. The other construction seems to me to be more conforpiable to the probable views of the Legislature, and does no violence to the context and order of the sentence; and only renders it necessary, in order to .make the sense-of the .Sentence clear and intelligible, that the words which are necessarily understood, shall be repeated in their proper place, so as to read thus ; “ whose fathers or mothers are citizens at the time of the birth of such children, or were citizens at the time of the birth of such children, &c. ” The word “ are,” thus used, would necessarily have a future meaning, and import the same as “may be,” “ shall be.” This construction would afford an uniform rule, applicable to all future, as well as past, cases, and a rule which would most naturally suggest itself to those who were about to extend the rule of naturalization, beyond the limits of the common law; to wit: that the child should follow the condition of its parents, at the time of its birth. But, to adopt the first construction, would not avail the lessors of the plaintiff; for, although, if the act of 1783 *285 gave citizenship to Mrs. Paradise, if she was not before a citizen; and, upon the construction aforesaid, the act of 1786 would, in that case, give citizenship to Mrs. liarziza., and the act of 1792 might, if not contrary to the act of Congress of 1790, have given citizenship to her eldest son, born in 1789; yet, the act of Congress of March, 1790, prevented the act of Virginia of 1792, from having that effect. That act of Congress provides, that “the children of citizens of the United States that may be born boyond sea, or out of the limits of the United States, shall he considered as natural bom citizens; provided, that the right of citizenship shall not descend to persons, whose fathers have never been resident in the United Slates;” and all the subsequent laws of Congress on this subject, have the same provision. Virginia had no power to pass any law, counteracting the effect of this act. Although Virginia may authorise aliens to inherit lands in Virginia, she has not done so. She has left the right of inheritance as an incident to the right of citizenship; and, if she attempts to confer citizenship upon foreigners, in a manner prohibited by the constitution and laws of the United States, such attempt cannot enure to another purpose, and give a right to inherit, independent of citizenship.
I think that Mrs. Barziza never was a citizen, her mother not being a citizen at the time of her birth; that - her children born abroad cannot he citizens, and of course, have no title to the land in question. Neither can they claim under the treaty of London. It has been decided upon this very title, in the case of Orr v. Hodgson fy Hopkins, in the Supreme Court of the United States, that the ease of these parties, (they not being British subjects,) was nut provided for by that treaty. I observe, that in that case, the Court, without discussion, considered Mrs. Paradise, as an alien.
The judgment is right, and ought to he affirmed.
*286 Judge Coaltek.
Philip Ludwell resided in Virginia many years before Revolutionary war, and possessed largo estates there, and it is probable, though it does not appear from the evidence in the cause, that his daughter Lucy, afterwards Lucy Paradise, was born there. He removed to, and resided in London previous to the year 1767, in which year he made his will, and soon after died. Lucy, his daughter, in. 1769, her father being then dead, intermarried with John Paradise, only son of Peter Paradise, of the county of Middlesex, in England, where she continued to reside with him until after the war. They had a daughter, who, it is admitted, was born about the year 1771 or 1773; at any rate, before the Declaration of Independence. This daughter was married about the year 1787, to Count Barzisa, a Venetian, and resided with him from that time until her death, in Venice, where she had several sons, who are lessors of the plaintiff.
I am of opinion, that although Mrs. Paradise may have been born in Virginia, yet, on the Declaration of Independence she was no more a citizen, participating in that declaration and forming a part of the new empire, than any other citizen of London. Had she there adhered to the Royal cause, she was not guilty of treason against the State; whilst, on the contrary, had she- there, by overt act, adhered to the cause of the revolted colonies, she would have been guilty of treason against the King. She was his natural born subject, and so continued until the close of the Revolution. She comes within the description of a British subject, as given in the 3rd section of the act of May, 1779, chap. 14, as explained by the 5th section of the act of October, 1779, chap. 18. And, although, perhaps, within the letter of the act of May, 1779, chap. 55, § 1, declaring “who shall be deemed citizens,-” she cannot be ■ considered to be within the meaning of that act, as it cannot be supposed that the Legislature, at the same session, *287 and as it were, by the same act, declared her to be a British subject and a citizen, of the State. Suppose a citizen of London, not domiciled, but travelling here with his wife, long before the Revolution, had had a child born here, who, with his parents, ever after resided in London; he would he within the letter, but I presume not within the meaning of the act.
If she was a British subject and not a citizen of Virginia during the Revolutionary struggle, she was one of those for whose i ights the treaty of peace made provision. She was protected by that treaty, with other British subjects, and if no other act of the Legislature had passed, would have been protected by that alone. In October, 1783, chap. 16, the Legislature, however, passed a law “for the admission of emigrants, and declaring their right to citizenship.” From the preamble, as well as title, the great object of that law was the admission of foreigners to the rights of citizenship. The first section, however, begins by declaring who shall be deemed citizens, and uses nearly the same words as to natives, which are used in the act of May, 1779, above-mentioned. By this act Mrs. Paradise theretofore declaredly a British subject, now claims to have been made a citizen of Virginia, without even the necessity of migrating thereto, much less of taking the oath of allegiance, &c. Suppose, instead of being a married woman, she had been an adult male when the act of May, 1779, chap. 14, passed, and instead of entering into the employment of the States, had, by overt act, adhered to -the King, was it the intention of the act of 1783 to confer a citizenship without emigration or oath, on such person ? Or, in case of emigration, that he should he ipso facto and instanter, eligible to offices, Legislative, Executive or Judicial? The preamble to the act of 1783 says, “that wisdom and safety suggest the propriety of guarding against the introduction of secret enemies, and of keeping the offices of government in the hands of citizens, intimately acquainted with the spirit of the constitution and the genius *288 of the people, as well as permanently attached to the common jnterest;” and the latter clause of the first section, prescribes the time of residence and other acts, entitling naturalized citizens to hold offices. Why should a native of the State, who had adhered to the King during the Revolution, be more worthy of confidence on his return to the country, than a native of Great Britain coming with him? Refugees, as they were called, (citizens or natives Who left the country after the commencement of hostilities,) were certainly not favorites of the Legislature.
I doubt, therefore, whether the act of 1783 intended to reach cases of this kind., and which, as it regarded property, were sufficiently protected by the treaty. It was not important or necessary, and I am not satisfied that it was according to the policy of the times, to invest natives of this description, who did not think proper to return to their country, with the character of citizenship, and thus rendered capable of transmitting, by inheritance, the soil of the country to their children, who might be, to all intents and purposes, aliens to that country. The treaty, enabling them to hold their property, to alien or devise it to citizens, and to transmit it, by inheritance, to their next of kin, being citizens, it appears to me, at present, to be all that justice required, or policy rendered proper. I presume it never could have been intended, that native refugees were intended to be made citizens by that act, even if the act of October, 17¿3, chap. 17, had never been passed, although they came within the letter of the act, lifree persons born within the territory of the Commoriwealth.” The 17th chapter is not enacted as an exception to the generality of the words above quoted from the 16th chapter, so as to leave refugees on the ground of foreigners generally; but, it excludes either native or citizen refugees from the right, even of migrating to, or becoming citizens of this Commonwealth. But for this act, they would have stood under the former acts, and the act of 1783, chap. 16, as all other foreigners or natives who were *289 out of the country, and elected to remain so, only entitled to migrate and become citizens. Surely native refugees would not have been made citizens by the act of 1783, chap. 16, and entitled to all the privileges of citizenship, if the act of the same session, chap. 17, excluding them from the privilege of all the rest of the world, that of migrating and becoming citizens, had not been made. That act was made to except them from the privilege conferred on all the rest of the world; not to except them out of the general expressions of the first act.
Those words, then, were not intended to be taken in their utmost latitude, any more than the same words used in the act of May, 1779; which, by reason of other laws, did not, as is above shewn, embrace the ease of Mrs. Paradise. I, therefore, strongly incline to think, that, taking all the laws together, and also, the treaty of peace, with a view of the policy of the country, as expressed in the preamble of the act of 1783, it was not intended that cases like her’s should be covered by that act, but left, as to the rights of the parties, under the treaty; and that, if she wished to become a citizen, she was obliged, like all other British subjects, to migrate, and take the oath, &c., required by law.
It does not appear that she ever became a citizen in this way, and consequently, if she was not made a citizen by the act of 1783, she stood under the treaty of peace, and what is called Jay’s treaty, and no one, except a citizen or a subject of Great Britain, would inherit her real estate.
If she never was a citizen, according to this view of the case, neither was her daughter. But, she died before her mother, leaving the lessors of the plaintiff, her children. Had they migrated and become citizens before the death . of their grandmother, they could have inherited her lands as the next of kin. But, when she died, they were natives and subjects of Venice, and were not provided for by the treaty aforesaid.
*290 If, however, I am wrong in this view of the case, then question arises, whether, taking it that Mrs. Paradise was made a citizen of Virginia by the act of 1783, and not bef°re> that will have any effect on the case before the Court.
If Mrs. Paradise was made a citizen by the act of 1783, and the words of that act as to children, wheresoever born, can be construed in the present tense thus, a child, whose father or mother are now, by virtue of this act, or any other act a citizen, shall be a citizen, then Mrs. Barziza was also made a citizen by that act. And, if those words can also have a prospective, as well as a present interpretation, then any child, born abroad, which Mrs. Paradise or Mrs. Barziza might thereafter have, would be citizens. Mrs. Barziza cannot claim her citizenship by reason that her mother was a citizen at her birth. She must claim it hy the operation of those words in the act, construed as aforesaid, and conferring the right of citizenship on her, as the then child of her mother, then herself, for the first time, made a citizen.
But, if these word's can be thus construed, so as to confer citizenship on Mrs. Barziza, but cannot be construed also prospectively, then her children, born abroad thereafter, would not be citizens by virtue of the act of 1783. But, the act of 1786, chap. 10, if construed in the same way, would confer citizenship on any such child, born between 1783 and 1786. Whether either of the lessors of the plaintiff would be found to be in this predicament, I have not particularly enquired. I had, at first, some doubt, whether the acts ought not to be so construed; but, on mature reflection, I think they cannot. It is pretty manifest, that these words cannot have both a present and prospective interpretation; and we must, therefore, give them one or the other. It seems to me most reasonable to give the latter. Suppose an emigrant to this State, between 1779 and 1783, had brought his infant children with him, lea *291 ying his adult children in foreign parts. The former would have been citizens under the act of 1779. Was it the intention of the Legislature, by the act of 1783, to confer citizenship, even without migration, on the adults and their children, then, to all intents and purposes aliens to the State ? To interpret the act in the present tense, as above stated, would have this effect.
If the words, then can only he construed prospectively, Mrs. Barziza never was a citizen, either under the act of 1783 or J 786; nor is she so made by any act of Congress that I can discover. Her children, consequently, were not made citizens; and, as they are not provided for by the treaties aforesaid, the judgment must be affirmed.
Judge Cabell.
Whether the Barzizas, lessors of the plaintiff, are citizens of this Commonwealth, capable of taking lands by descent, depends on the question, whether their grandmother, Mrs. Paradise, was a citizen at, the time of the birth of their mother, Mrs. Barziza.
Our Revolutionary struggle, which terminated successfully in the establishment of our Independence, separated us, not only from our former Sovereign, the British King, hut from our former brethren, the subjects of the British Empire. In the emphatic language of our Declaration of Independence, it made them, as it did all the rest of mankind, “enemies in war, in peace friends.” They became aliens t o us, and we aliens to them. There is nothing in the case of Mrs. Paradise, to distinguish her from any other subject of the British Empire. Her birth in the former Colony of Virginia, gave her no greater rights than were possessed by any other British subject. At that time the inhabitants of Virginia and the inhabitants of England were equally British subjects, and could mutually inherit lands from each other, whether lying in England or Virginia. But, if Mrs. Paradise could, after our *292 Revolution, have inherited lands in this country, so might any other subject of Great Britain. She had ceased to be an inhabitant of this country before the commencement of Revolution; during the whole of its progress, she and her husband remained and resided in England, pursuing their vocations there; they took no part on our side, they espoused not our cause; nor should they be permitted to participate iri the fruits of our success, except in the mode prescribed by our laws in relation to other aliens. These are my opinions on general principles, independently of any consideration drawn from our statutory regulations, declaring who shall be British subjects. But, the statute of 1779, seems to me to leave no doubt on the subject. It is impossible to separate Mrs. Paradise from that class of persons expressly declared by that statute to be British subjects.
But, it is contended, that, admitting Mrs. Paradise to have been previously a British subject, she was, as a native of Virginia, made a citizen by the act of 1783. I do not think it material to this case, and therefore shall not give any opinion, whether Mrs. Paradise was, or was not embraced by that act. The Barzizas can only claim through their mother. Admit that Mrs. Paradise became a citizen by the act of 1783; was Mrs. Barziza made a citizen by that act? If she was so, it must be by the operation of the words in the act, “ all children wheresoever born, whose fathers or mothers are, or were citizens at the time of the birth of such children, &c. ” The construction of this act appears to me too plain for ingenuity itself to raise a doubt. It was the intention of the Legislature to establish, not only a general, but a permanent rule, for all cases where citizenship is claimed by right of birth from citizen parents. The right is restricted to children ‘ ‘ whose ’ fathers or mothers are, or were citizens at the time of the birth of such childrenbut, the right is extended, as well to cases where the birth occurred before, as where it might occur after the passage of the act. Previous cases *293 are provided for by the words “M>ere,” and subsequent cases by the words “are citizens at the time of their birth, &c.” It is no objection to this construction, that the word “are” is in the present tense, and must, therefore, have a present signification. Even present time is relative. It may have been present formerly; it may be present now; or, it may be present at some future period. The word “are,” therefore, although in the present tense, has, when applied to a transaction yet to come, a future signification, and is only equivalent to shall, or may he. And it must be so construed in the case before us; for, it related to parents who then were, or who might be citizens at the time of births then occurring, or which might thereafter occur. Mrs. Paradise, then, not being a citizen at the time of the birth of Mrs. Barziza, Mrs. Barziza was not made a citizen by the act of 1783, and of course, could transmit to her children no right to inherit lands in this country; nor is the case of her children helped by the British treaty, as they are not British subjects.
I am, therefore, of opinion to affirm the judgment.
The following was entered up as the judgment of the Court:
The Court, &c., is of opinion, that Mrs. Barziza never was a citizen of this Commonwealth, and therefore could not transmit any right of inheritance to lands in this country; that her children, the appellants, are also aliens, and incapable, under the laws, of inheriting lands here; and that, not being British subjects, they cannot claim under the treaty between this country and Great Britain; and, that there is no error in the said judgment. Therefore, it is considered that the same be affirmed, &c.

Judge Brooke, did not sit in this cause.